Eastern Mtn. v. Osprey                    CV-04-086-SM  03/02/05

UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE


Eastern Mountain Sports, Inc.,
     Plaintiff

     v.                                    Civil No. 04-86-SM
                                           Opinion No. 2005 DNH 036
Osprey Packs, Inc.,
     Defendant


**O R D E R**


In this patent suit, Eastern Mountain Sports, Inc. ("EMS") alleges that Osprey Packs, Inc. ("Osprey") has made, used, and/or sold backpacks that infringe EMS's patent, U.S. Patent No. 6,422,439 ("the '439 patent"). Osprey denies infringement, and asserts a counterclaim against EMS for a declaratory judgment of "patent invalidity, unenforceability, and noninfringement." Answer and counterclaim (document no. 5) at 5.


Osprey moves for summary judgment as to the sole count in EMS's complaint, saying that, as a matter of law, its accused backpacks do not infringe the '439 patent, either literally or under the doctrine of equivalents. EMS objects, asserting that genuine issues of material fact preclude summary judgment on

behalf of either party.  The parties do, however, agree that the '439 patent lends itself to judicial construction without the need for a <u>Markman</u> hearing.  <u>See</u> <u>Markman v. Westview Instruments, Inc.</u>, 517 U.S. 370 (1996).

## Standard of Review

I.   <u>Summary Judgment</u>.

When ruling on a motion for summary judgment, the court must "view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor."  <u>Griggs-Ryan v. Smith</u>, 904 F.2d 112, 115 (1st Cir. 1990).  Summary judgment is appropriate when the record reveals "no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In this context, "a fact is 'material' if it potentially affects the outcome of the suit and a dispute over it is 'genuine' if the parties' positions on the issue are supported by conflicting evidence."  <u>Intern'l Ass'n of Machinists & Aerospace Workers v. Winship Green Nursing Center</u>, 103 F.3d 196, 199-200 (1st Cir. 1996) (citations omitted).

2

Nevertheless, if the non-moving party's "evidence is merely colorable, or is not significantly probative," no genuine dispute as to a material fact has been proved, and "summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986) (citations omitted). As the Court of Appeals for the First Circuit has observed, "the evidence illustrating the factual controversy cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve at an ensuing trial. Conclusory allegations, improbable inferences, and unsupported speculation will not suffice." Cadle Co. v. Hayes, 116 F.3d 957, 960 (1st Cir. 1997) (citations and internal quotation marks omitted). See also Coyne v. City of Somerville, 972 F.2d 440, 444-45 (1st Cir. 1992) ("[T]hough for pleading purposes the line between sufficient facts and insufficient conclusions is often blurred, we nonetheless require that it be plotted.") (citation and internal punctuation omitted).

The key, then, to defeating a properly supported motion for summary judgment is the non-movant's ability to support his or her claims concerning disputed material facts with evidence that

conflicts with that proffered by the moving party.  See generally Fed. R. Civ. P. 56(e).  Consequently, while a reviewing court must take into account all properly documented facts, it may ignore bald assertions, unsupported conclusions, and mere speculation.  See Serapion v. Martinez, 119 F.3d 982, 987 (1st Cir. 1997).

II.  Patent Construction.

Patent infringement analysis involves two steps: first, properly construing the asserted claim; and second, determining whether the accused method or device infringes the asserted claim as properly construed.  See Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1581-82 (Fed. Cir. 1996) (citing Markman v. Westview Instruments, Inc., 52 F.3d 967, 979 (Fed. Cir. 1995), aff'd, 517 U.S. 370 (1996)).  Step one of that process - claim construction - presents a question of law to be resolved by the court.  See Pitney Bowes, Inc. v. Hewlett-Packard Co., 182 F.3d 1298, 1304 (Fed. Cir. 1999).  The second step - determining whether the accused process or device infringes the patent - presents a question of fact.  Id.  "Thus, summary judgment of non-infringement can only be granted if, after viewing the

4

alleged facts in the light most favorable to the non-movant, there is no genuine issue whether the accused device is encompassed by the claims." Pitney Bowes 182 F.3d at 1304.

Construing patent claim terms generally means ascertaining the meaning of those terms in light of the intrinsic evidence of record, which includes: the claims, the specification, and the prosecution history. See Vitronics, 90 F.3d at 1582. But, the court may consider extrinsic evidence as well. See Apex Inc. v. Raritan Computer, Inc., 325 F.3d 1364, 1371 (Fed. Cir.) ("Courts may also review extrinsic evidence to assist them in comprehending the technology in accordance with the understanding of skilled artisans and as necessary for actual claim construction."), cert. denied, 124 S.Ct. 922 (2003). Extrinsic evidence is external to the patent, "such as expert testimony, inventor testimony, dictionaries, and technical treatises and articles." Pitney Bowes, 182 F.3d at 1308 (citing Vitronics, 90 F.3d at 1584). See generally Ferguson Beauregard/Logic Controls v. Mega Systems LLC, 350 F.3d 1327, 1338 (Fed. Cir. 2003) ("The ordinary and customary meaning of a claim term may be determined by reviewing a variety of sources. Some of these sources include

the claims themselves, dictionaries and treatises, and the written description, the drawings, and the prosecution history.") (citations omitted).

Giving proper effect to disputed technical terms in a patent requires a court to construe them as they would be construed by those skilled in the relevant art. See Hoechst Celanese Corp. v. BP Chems. Ltd., 78 F.3d 1575, 1578 (Fed. Cir. 1996) ("A technical term used in a patent document is interpreted as having the meaning that it would be given by persons experienced in the field of the invention, unless it is apparent from the patent and the prosecution history that the inventor used the term with a different meaning."). See also Ferguson, 350 F.3d at 1338 ("In the absence of an express intent to impart a novel meaning to the claim terms, the words take on the full breadth of the ordinary and customary meanings attributed to them by those of ordinary skill in the art."). Here, nothing suggests that the terms in dispute are used in the '439 patent in any way other than as they would be commonly understood by those skilled in the relevant art.

In construing the disputed claim terms in the '439 patent, the court has relied upon the patent's specification (including the claim language itself), its prosecution history, and the exhibits submitted by the parties, including an EMS "Waterslide Hydration Pack," which utilizes the patented invention, and an Osprey "Eclipse 26+5" backpack, which is one of the allegedly infringing products manufactured and/or sold by Osprey.

**Background**

I.   The Claims at Issue.

The '439 patent teaches a "combination backpack and hydration pack" which are "detachably connected to each other." '439 patent, Abstract. "The two portions can thus be used together as a hydration pack/standard backpack combination or separately as a pack solely for hydration purposes." Id. The '439 patent sets forth two independent claims (one and five), and four dependent claims (two, three, four, and six).

The first independent claim of the '439 patent (claim one) teaches:

7

A combination backpack and hydration pack, comprising:

a hydration pack portion, having a bladder portion for holding liquid, a pair of shoulder straps with mating members disposed at a bottom end of each shoulder strap, and a first pair of complementary mating members disposed at a bottom of the hydration pack portion for receiving the mating members of the shoulder straps when the hydration pack portion is used separately; and

a backpack portion attachable to and circumscribing the hydration pack portion for providing additional carrying space, the backpack portion having a pair of openings disposed at a top of the backpack portion for receiving each shoulder strap and a second pair of complementary mating members disposed at a bottom of the backpack portion for receiving the mating members of the shoulder straps to attach the backpack portion to the hydration pack portion, so that the hydration pack portion and the backpack portion are detachably connected to each other.

The '439 patent, 5:22-41 (emphasis supplied).

Claim five, the other independent claim of the '439 patent, teaches:

A two-in-one hydration pack, comprising:

a hydration pack portion having a bladder compartment for holding liquid;

a backpack portion attachable to and circumscribing the hydration pack portion for providing additional carrying space; and

8

mating means for attaching the backpack portion to the hydration pack portion such that the backpack portion and the hydration pack portion are detachably connected to each other, wherein the hydration pack portion further comprises a pair of shoulder straps, each said shoulder strap having a bottom end selectively detachably connected to either of the hydration pack portion and the backpack portion by way of the mating means, wherein the backpack portion further comprises <u>passage means disposed in an upstanding wall of the backpack portion for receiving the pair of shoulder strap[s]</u> when the bottom end of each shoulder strap is detachably connected to the backpack portion by way of the mating means.

The '439 patent, 6:12-33 (emphasis supplied).

II.   <u>The Patented EMS Backpack</u>.

The patented EMS pack is, then, comprised of two distinct units: a small "hydration pack" and a larger "backpack unit." The hydration pack has two shoulder straps, the upper ends of which are permanently affixed to the top of the hydration pack. Attached to the lower (loose) ends of those shoulder straps are connectors of some sort like, for example, plastic snap buckles. The backpack unit itself has no shoulder straps.  Instead, it has "a pair of openings disposed at a top of the backpack," '439 patent, 5:33-34, or a "passage means," <u>id</u>. at 6:29, for "receiving" the shoulder straps of the hydration pack and through

9

which those straps pass.  When combined with the hydration pack, the backpack is supported by the straps permanently attached to the hydration pack.

Both claim one and claim five of the '439 patent teach a combination backpack that can be configured in either of two ways.  First, the user might simply connect the loose ends of the shoulder straps on the hydration pack to the bottom of the hydration pack itself.  In that configuration, the user carries only the small hydration pack (essentially a small pack that contains a single compartment, into which the user places a bladder filled with potable liquid).  Alternatively, the user may configure the backpack so the hydration pack is placed into the rear of the larger backpack unit's cargo compartment, the straps of the hydration pack are passed out through a pair of openings (claim one) or a passage at the top of the backpack (claim five), and those straps are then connected to the bottom of the backpack unit with, for example, plastic snap buckles.  In that configuration, the backpack unit and hydration pack are connected and, with the exception of the shoulder straps, the hydration pack is contained entirely within the storage compartment of the

10

backpack unit.  See '439 patent, 2:9-10 ("The hydration pack fits within the backpack.").  See also Id., 4:2-3 ("The hydration pack portion fits easily within the backpack portion"). Configured in that manner, the EMS combination pack allows the user to carry both potable liquid and various items of gear, clothing, etc.

The '439 patent's specification describes the two configurations of the combination backpack as follows:

> [I]f the user wishes to use the hydration pack portion separately (i.e., without attaching the backpack portion), then the user simply attaches the shoulder straps by way of the male snap buckle on each shoulder strap to the airlock buckles [at the bottom of the hydration pack].  On the other hand, if the user wishes to attach the backpack portion to the hydration pack portion for additional carrying space, then the user detaches the shoulder straps from the snap buckles on the hydration pack portion, slides the shoulder straps through slots on the backpack portion, and fastens the shoulder straps to the snap buckles on the backpack portion.

'439 patent 4:28-39 (emphasis supplied) (reference numbers omitted).

11

III. The Allegedly Infringing Osprey Pack.

Like the EMS hydration backpack, the allegedly infringing Osprey pack is comprised of two distinct units: a small "day pack" (into which a user may place a hydration unit which is available for purchase from Osprey, albeit separately from the pack itself), and a larger backpack unit. As is the case with the EMS combination backpack, only Osprey's day pack has shoulder straps (which are permanently affixed to the top of the unit, and the loose ends of which are fitted with connector snaps). And, like the EMS pack, Osprey's day pack and the larger backpack unit can be "detachably attached" - that is to say, the user can configure the product in either of two ways. First, he or she may use only the day pack, by connecting the loose ends of the shoulder straps, by means of plastic snap buckles, to the bottom of the day pack itself.

Alternatively, the user can configure the product to use both the day pack and the larger backpack together. To do so, the user slides the body of the day pack into a pocket or slot at the rear of the backpack unit. The day pack is kept firmly in place by means of hook and loop fasteners (also known as

12

"Velcro").  The shoulder straps of the day pack extend out of the top of that pocket and the user then connects them to the bottom of the backpack unit, by means of plastic snap buckles.  Finally, to insure that the two units are firmly joined together, the user connects straps that are permanently attached to the top of the backpack unit and extend over the user's shoulders, into the mating connectors which are permanently affixed to the shoulder straps on the day pack unit.

Because the EMS design involves placing the hydration pack completely within the backpack, there is no need for additional straps or fasteners to insure that the two units do not separate; the hydration pack is too large to slip out of the "pair of openings" (or the "passage means") through which its straps extend.  The Osprey design, however, places the hydration pack into a slot or pocket on the exterior of the backpack.  Accordingly, absent additional connectors to supplement the hook and loop fasteners, the two units might easily separate if sufficient weight were placed into the backpack unit.

13

## Discussion

I.   Construction of the Disputed Claim Terms.

The parties do not appear to disagree as to the meaning of the claim terms that are central to this litigation; instead, they seem to focus on whether Osprey's products infringe claims one and five of the '439 patent. Nevertheless, a brief discussion of the critical claim terms is warranted.

Claim one of the '439 patent requires a "pair of openings disposed at a top of the backpack portion for receiving each shoulder strap." Id., 5:33-35 (emphasis supplied). The plain language used in that claim undeniably requires two openings in the top of the backpack unit - one to accommodate each of the two shoulder straps. And, it is equally plain that the shoulder straps of the hydration pack are designed to pass "through" those slots, from the interior of the backpack unit to the exterior. See id. at 4:37 (explaining that the user "slides the shoulder straps through slots on the backpack portion, and fastens the shoulder straps to the snap buckles on the backpack portion.") (reference numbers omitted). See also Plaintiff's memorandum in opposition to summary judgment (document no. 22) at 8 and 9.

14

As is authorized by the Patent Act, claim five of the '439 patent is written in "means-plus-function" form.  The relevant portion of the Act provides that:

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts <u>described in the specification and equivalents thereof</u>.

35 U.S.C. § 112 (emphasis supplied).  Construing "means-plus-function" limitations is a question of law and involves two steps:

> First, the court must identify the claimed function. The court must construe the function of a means-plus-function limitation to include the limitations contained in the claim language, and only those limitations.  It is improper to narrow the scope of the function beyond the claim language.  It is equally improper to broaden the scope of the claimed function by ignoring clear limitations in the claim language. Ordinary principles of claim construction govern interpretation of the claim language used to describe the function.
>
> After identifying the claimed function, the court must then determine what <u>structure, if any, disclosed in the specification corresponds to the claimed function</u>.  In order to qualify as corresponding, the structure must not only perform the claimed function, but the specification must clearly associate the structure with performance of the function.

15

<u>Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.</u>, 296 F.3d 1106, 1113 (Fed. Cir. 2002) (citations omitted) (emphasis supplied). <u>See also</u> <u>Valmont Indus. v. Reinke Mfg. Co.</u>, 983 F.2d 1039, 1042 (Fed. Cir. 1993) ("The applicant must describe in the patent specification some structure which performs the specified function. Moreover, a court must construe the functional claim language to cover the corresponding structure, material, or acts described in the specification and equivalents thereof. Section 112 thus permits means-plus-function language in a combination claim, but with a 'string attached.' The 'attached string' limits the applicant to the structure, material, or acts in the specification and their equivalents. Indeed the section operates more like the reverse doctrine of equivalents than the doctrine of equivalents because it restricts the coverage of literal claim language.") (citations omitted).

The relevant language at issue in claim five is: "the backpack portion further comprises <u>passage means</u> disposed in an upstanding wall of the backpack portion <u>for receiving the pair of shoulder strap[s]</u>." '439 patent, 6:28-31 (emphasis supplied). Here, as is the case with claim one, the parties appear to agree

16

as to the meaning and scope of the language employed in claim five: "the claimed function of the passage means recited in claim 5, is that of 'receiving the pair of shoulder strap[s]." Defendant's memorandum (document no. 14) at 10.  See also Plaintiff's memorandum at 15 ("EMS agrees with Osprey that the claimed function of the 'passage means' in claim 5 is to receive the shoulder straps of the hydration pack.").

Use of the word "passage" in claim five, as well as the description of the invention elsewhere in the specification, implies that the "passage means" describes a means of passage in which the straps pass "through" something - in this case, the rear wall of the backpack unit.  That interpretation of the "passage means" is consistent with both the word "passage" - an opening through which things may pass - as well as the detailed description of the invention set forth in the specification.

Accordingly, the court construes the "passage means" of claim five to mean an opening from the interior of the backpack unit to the exterior of that unit, through which the straps of the hydration pack may pass, so they might be attached to the

17

connectors which are external to the backpack unit and located at the bottom of that backpack unit. The "means-plus-function" limitation in claim five does not describe a structure by which the hydration pack's straps connect to the main backpack unit without passing through an upstanding wall of the backpack unit. Among other things, neither claim five nor the remainder of the '439 patent's specification describes such a situation, nor does the patent teach how the hydration pack would be firmly secured to the backpack unit if the hydration pack were not contained within the backpack unit. In other words, if the hydration pack was _external_ to the main backpack unit (i.e., its shoulder straps did not pass "through" the rear wall of the backpack), the shoulder straps alone would not secure the two units together. In that situation, additional fasteners (like the hook and loop and plastic connectors employer by the Osprey pack) would be needed to securely join the two independent units.

As it is drafted, claim five of the '439 patent teaches a combination backpack unit that relies upon the smaller hydration pack being placed completely within the larger backpack unit, _see id_. 2:9-10; 4:2-3, with a "passage" through which the hydration

18

pack's strap may pass, but which "passage" is sufficiently small to contain, or prevent the hydration pack from passing through it as well.

II. Literal Infringement.

"A claim is literally infringed when the accused device literally embodies each limitation of the claim." Kraft Foods, Inc. v. Int'l Trading Co., 203 F.3d 1362, 1370 (Fed. Cir. 2000) (citing Pall Corp. v. Micron Separations, Inc., 66 F.3d 1211, 1217 (Fed. Cir. 1995)). In this case, it is plain that the accused Osprey packs do not literally infringe claim one of the '439 patent since they do not utilize "a pair of openings disposed at a top of the backpack portion for receiving each shoulder strap." '439 patent, 5:33-35. EMS does not seriously contend otherwise.

Nor do the accused Osprey packs literally infringe claim five of the '439 patent. Rather than utilizing a "passage means" in the backpack unit, through which the straps of the day pack may pass, the Osprey packs utilize a slot or pocket at the rear of the backpack unit, into which the body of the day pack slides.

19

The straps on the Osprey day pack unit do not "pass through" the upstanding wall of the main backpack unit; instead, they present from the top of the pocket on the rear of the backpack unit. And, rather than "receiving the pair of shoulder strap[s]" of the day pack, the pocket on the Osprey backpack receives the body of the day pack.

Nevertheless, EMS contends that, if adjusted in a particular manner, the accused Osprey packs do infringe the '439 patent.

> Osprey's contention that no structure in the [accused] backpacks functions to receive the shoulder straps is both legally and factually incorrect.  It is legally incorrect because an accused device may be found to infringe if it is reasonably capable of satisfying the claim limitations, even though it may also be capable of non-infringing modes of operation.

> Osprey's contention is factually incorrect because the opening of the [accused] backpacks in fact receives the [day pack's] shoulder straps, particularly when the [day pack] is adjusted in the pocket of the [accused] backpack[s].  In other words, the [accused] backpacks are reasonably capable, by adjustment, of satisfying the 'passage means' language of claim 5.  When the [day pack] is adjusted [so that it is placed very deep into the pocket on the rear of the backpack unit], its shoulder straps pass through the opening in the back of the [accused] backpacks.

20

Plaintiff's memorandum at 16-17 (citations and internal punctuation omitted). Essentially, EMS claims that a user may slide the day pack so deeply into the pocket on the rear of the Osprey backpack unit, that the top portion of the straps are actually below the opening at the top of the pocket. In that configuration, EMS says the shoulder straps "pass through" an opening (i.e., the pocket) in the rear wall of the backpack unit. The court disagrees.

Simply because the accused devices can be configured in such a way that a very small portion of the shoulder straps extend into the pocket on the rear of the backpack unit does not cause the accused devices to infringe. Even in that configuration, the straps do not "pass through" a "passage" in an upstanding wall of the backpack; instead, they extend out of the pocket which is stitched to the back of the backpack unit. And, contrary to EMS's suggestion, the pocket on the Osprey packs does not "receive" the shoulder straps. Rather, it receives the body of the day pack, and the straps then present out of the top of that pocket - they do not travel through a passage in the rear wall of the backpack unit.

21

III. Doctrine of Equivalents.

Although the doctrine of equivalents "is not free from confusion," it remains viable. Warner-Jenkinson Co. v. Hilton Davis Chem. Co., 520 U.S. 17, 21 (1997). Under the doctrine,

> a product or process that does not literally infringe upon the express terms of a patent claim may nonetheless be found to infringe if there is "equivalence" between the elements of the accused product or process and the claimed elements of the patented invention.

Id. (citing Graver Tank & Mfg. Co. v. Linde Air Products Co., 339 U.S. 605, 609 (1950)). In Warner-Jenkinson, the Supreme Court clarified the doctrine of equivalents, essentially holding that, in order to respect the scope of patent protection, and to preclude enlargement of that protection through application of the equivalents doctrine,

> [e]ach element contained in a patent claim is deemed material to defining the scope of the patented invention, and thus the doctrine of equivalents must be applied to individual elements of the claim, not to the invention as a whole. It is important to ensure that the application of the doctrine, even as to an individual element, is not allowed such broad play as to effectively eliminate that element in its entirety.

Id. at 29 (emphasis supplied). On this record, it is clear that the accused Osprey packs do not infringe either claim one or claim five of the '439 patent under the doctrine of equivalents.

As to claim one of the '439 patent, EMS asserts that Osprey's "use of a single opening instead of a pair of openings infringes claim 1 of the '439 Patent under the doctrine of equivalents. A single opening for the [day pack] shoulder straps performs substantially the same function, in substantially the same way, to achieve substantially the same result as does a pair of openings for shoulder straps." Plaintiff's memorandum at 21-22. Again, the court disagrees.

The "pair of openings" taught by claim one allow the hydration pack to be placed entirely within the cargo compartment of the EMS backpack unit. See, e.g., '439 patent, 2:9-10; 5:31-33. Then, the straps of the hydration pack are passed out through those openings, so the loose ends of the straps may be connected to the bottom of the backpack unit. Provided that each of those openings is smaller than the hydration pack, that design, as noted above, prevents the hydration pack from

23

disengaging from the backpack unit.  And, once the loose ends of the hydration pack's straps are connected to the backpack unit, it allows the two units to remain securely connected, without the need for any additional fasteners.

The Osprey packs, on the other hand, secure the day pack in an external pocket which is stitched to the rear of the backpack unit.  That pocket is designed to receive the <u>body of the day pack</u>, not its shoulder straps.  Consequently, while the Osprey packs achieve a result that is similar to that which is taught by claim one of the '439 patent - allowing two backpack units to be joined as one - the Osprey packs do so in a distinct manner that does not infringe claim one of the '439 patent under the doctrine of equivalents.

As to claim five, the parties disagree as to whether EMS is barred under the doctrine of prosecution history estoppel to assert that the accused backpacks infringe claim five of the '439 patent by virtue of the doctrine of equivalents.  <u>See generally Festo Corp. v. Shoketsu Kinzoko Kogyokabushiki Co.</u>, 535 U.S. 722, 740 (2002).  Nevertheless, even assuming that EMS is not

24

estopped, the accused Osprey packs do not infringe claim five of the '439 patent under the doctrine of equivalents.

As noted above, claim five of the '439 patent teaches a "passage means . . . for receiving the pair of shoulder strap[s]." As the court has construed that claim, it teaches a passage or opening in the backpack unit, through which the shoulder straps of the hydration pack pass. Nothing in the accused packs performs an equivalent function. Rather than locating the day pack within the cargo compartment of the backpack, the Osprey packs place the day pack in an external pocket. That pocket does not "receive" the shoulder straps of the smaller day pack. Instead, it "receives" the body of the day pack itself; the shoulder straps present at the top of that pocket. Even configured in the manner suggested by EMS (i.e., with the day pack pushed deeply into the pocket, so a portion of the straps are contained within the pocket), the straps still do not "pass through" the pocket. Rather, they present out of the top of that pocket. In other words, the pocket on the Osprey pack does not function as, nor is it the equivalent of, a "passage" from the interior to the exterior of the backpack unit

25

through which the straps may pass and secure the backpack unit and hydration unit together.

## Conclusion

Although determining whether an accused product infringes a patent claim (whether literally or under the doctrine of equivalents) is a question of fact, on this record, no properly instructed trier of fact could reasonably conclude that the accused Osprey packs infringe claim one or five of the '439 patent, as construed by the court, either literally or under the doctrine of equivalents. Accordingly, defendant's motion for summary judgment (document no. 14) is granted as to the sole count in plaintiff's complaint. It would appear that defendant's counterclaim asserting patent invalidity remains. Defendant shall advise the clerk within 30 days of the date of this order whether it wishes to pursue that claim.

**SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

March 2, 2005

26

cc: Eric D. Kirsch, Esq.
    Martha Van Oot, Esq.
    Norman H. Zivin, Esq.
    Pamela E. Phelan, Esq.
    Kenton L. Freudenberg, Esq.
    Thomas J. Donovan, Esq.